UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CLEAN EARTH DREDGING<br>TECHNOLOGIES, INC.,<br><br>Plaintiff,<br><br>    v.<br><br>SLRD COMPANY – MULLICA HILL,<br>LLC,<br><br>Defendant. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 12-1989<br>(JEI/KMW)<br><br>**OPINION** |

**APPEARANCES:**

GREENBERG & TRAURIG, LLP
Eric Aronson & Laurie Ann Poulos
200 Park Avenue
Florham Park, NJ 07932
     Counsel for Plaintiff

LIPMAN, ANTONELLI, BATT, GILSON, ROTHMAN & CAPASSO
Steven L. Rothman
110 North Sixth Street
P.O. Box 729
Vineland, NJ 08362
     Counsel for Defendant

**Irenas**, Senior District Judge:

This is a breach of contract case.  Plaintiff Clean Earth

Dredging Technologies, Inc. ("Clean Earth") claims, among other

things, that Defendant SLRD Company – Mullica Hill, LLC ("SLRD")

breached its contract with Clean Earth by closing a landfill

site to Clean Earth and that SLRD has been unjustly enriched by

refusing to return prepayments that Clean Earth made to SLRD.

1

Defendant SLRD counterclaims that Clean Earth has breached the contract by failing to pay SLRD for site maintenance performed under the contract.   Presently before the Court is Clean Earth's Motion for Summary Judgment on Counts I and III of its Second Amended Complaint as well as on Count II of SLRD's Second Amended Counterclaim.[1] (Dkt. No. 21)   For the reasons stated herein, Clean Earth's motion will be granted in part and denied in part.

## I.

For the purposes of this Motion, the Court resolves any factual disputes in favor of the Defendant, SLRD.[2]   This dispute centers on the removal and delivery of Fill Materials, which, in this particular case, consist of "recycled, lightly contaminated

---

[1] The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

[2] In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

In its reply brief, Clean Earth urges this Court to deem admitted all facts in Clean Earth's Statement of Undisputed Material Facts, as SLRD failed to submit a responsive statement with its Brief in Opposition pursuant to Local Rule 51.6. (P.'s Reply Br. 1, 4-5) After Clean Earth called attention to this omission, SLRD filed its Rule 51.6 Responsive Statement of Material Facts. (Dkt. No. 24) In a letter to the Court dated November 27, 2012, counsel for SLRD represented that counsel for Clean Earth acknowledged that the responsive statement had been omitted in error. (Dkt. No. 25) Clean Earth subsequently filed a reply to SLRD's Rule 51.6 statement. (Dkt. No. 26) Given that SLRD cured its failure to file the responsive statement, Clean Earth was able to file a reply to that statement, and counsel have acknowledged that the original failure to file the responsive statement was in error, the Court will not deem admitted all facts in Clean Earth's Statement of Undisputed Material Facts. *See, e.g., N.J. Envtl. Fed'n v. Wayne Twp.*, 310 F. Supp. 2d 681, 689 (D.N.J. 2004) (declining to deem facts admitted despite failure to file a Rule 56.1 statement where the party cured the failure and the opposing party was given the opportunity to respond to the statement).

soils and alternate fill materials." (Decl. of Eric S. Aronson, Esq. ("Aronson Decl.") Ex. B ("Supply Agreement") ¶ 1.1.1) These Fill Materials are used to fill depressions in the ground or change the grade of land.

Clean Earth is a Pennsylvania corporation that removes, processes, and receives Fill Materials and then transports and disposes of those materials.  (SUMF[3] ¶¶ 1-2)  SLRD is a New Jersey limited liability company that operates the Henry Harris landfill site in Harrison Township, New Jersey ("the Site"). (*Id.* ¶ 3)  The Site is in the process of being redeveloped so that commercial warehouses may be erected on top of the landfill.  The Site's redevelopment is subject to a February 7, 2006 Closure Plan Approval ("the Closure Plan") issued by the New Jersey Department of Environmental Protection ("NJDEP"). (*Id.* ¶¶ 4-5)  As part of the Closure Plan, the Site must be capped, filled, and graded in accordance with applicable law and permits.  (*Id.* ¶ 5)

On April 17, 2006, Clean Earth and SLRD entered into a Soil Supply Agreement ("the Agreement") in which Clean Earth agreed to supply and deliver Fill Materials to the Site and SLRD agreed to accept delivery of those Fill Materials.  (*Id.* ¶¶ 8-9; Supply Agreement)  The Agreement incorporated the Closure Plan.  (SUMF

---

[3] SUMF refers to Plaintiff's Statement of Undisputed Material Facts submitted in support of its Motion for Summary Judgment (Dkt. No. 21) pursuant to Local Rule 56.1.

¶ 6)  Under the Agreement, Clean Earth initially had a limited interim exclusive license "to supply Fill Materials to the Site" (Supply Agreement ¶ 2.1.1), which Clean Earth could convert to a permanent exclusive license.  (*Id.* ¶ 2.1.2)  If Clean Earth chose to make the exclusive license permanent, SLRD was required "to accept all Fill Materials delivered to the Site by Supplier [Clean Earth], with the understanding that the Site will require approximately two million . . . cubic yards of Fill Materials." (*Id.*)

To maintain its exclusive license, Clean Earth was required to both supply the Site with a minimum of 20,000 tons of Fill Materials per month and pay SLRD for those materials on a monthly basis.  (*Id.* ¶ 2.1.4)  The payment was calculated based on the Tipping Fees that Clean Earth owed.  (*Id.*)  The Agreement defines Tipping Fees as "the amounts payable by Supplier upon delivery of Fill Materials to the Site."  (*Id.* ¶ 1.1.1)  The Tipping Fees for the first 25,000 tons of Fill Materials delivered to the Site were set at $10.00 per ton.  (*Id.* ¶ 3.2.1)  For quantities above 25,000 tons, "the applicable Tipping Fee shall be equal to fifteen ($15.00) dollars per ton."  (*Id.* ¶ 3.2.2)

In the event that Clean Earth could not meet its monthly minimum tonnage, it had two options.  First, Clean Earth could make a payment, termed a "Catch Up Payment," to SLRD.  The Catch

Up Payment would be calculated by taking the difference between the amount of Fill Materials that Clean Earth delivered and the monthly minimum tonnage and then multiplying that amount by the $15.00 Tipping Fee.  (*Id.* ¶ 2.1.4(i))  Any Catch Up Payments made would be used to offset future Tipping Fees for any Fill Materials delivered that were in excess of the minimum monthly delivery.  (*Id.*)  Second, Clean Earth could choose to "convert the Exclusive Supply License to a non-exclusive license such that Redeveloper may solicit one or more third parties to provide soils to the Site."  (*Id.* ¶ 2.1.4(ii))  If Clean Earth chose the second option, "the Advance Payment[4] and any Catch Up Payments [would] continue to be credited against future Tipping Fees . . . fully offset."  (*Id.*)

There have been three amendments to the Agreement since its execution.  The first amendment occurred on October 11, 2006 and was made in response to certain preconditions imposed by the NJDEP before Phase I of the Closure Plan could begin.  That amendment suspended some of the parties' obligations until those preconditions were met and Phase I began.  (Decl. of Brian Horne ("Horne Decl.") Ex. A 1-2)  The amendment stated, "All terms and conditions of the Agreement shall remain in effect, except as

---

[4] The "Advance Payment" refers to an initial payment of $250,000 that Clean Earth was required to make to SLRD within ten days after the Agreement was executed.  (Supply Agreement ¶ 3.4.4)

5

specifically modified by the terms of this letter agreement."
(*Id.* ¶ 6)

The second amendment took place on July 6, 2010.  This
amendment was made in response to a Notice of Violation that
SLRD received on April 5, 2010 from the NJDEP Bureau of Solid
Waste Compliance and Enforcement and to "current market
conditions."  (Horne Decl. Ex. B ("July 6, 2010 Amendment") 1)
The parties "desire[d] to modify certain terms of the Agreement
and to suspend certain obligations of the Parties with respect
to the Agreement."  (*Id.*)  In this amendment, the parties
agreed, inter alia, to amend the Agreement so that SLRD could
accept fill materials from other sources as long as those
materials were in compliance with the needs of the Site and
Clean Earth approved the alternative sources ahead of time.
(*Id.* ¶ 1)  Even though SLRD could accept materials from third
parties, SLRD and Clean Earth agreed that Clean Earth's
Exclusive Supply License would remain in effect and SLRD's
acceptance of materials from third parties would not constitute
a violation of that license.  (*Id.* ¶ 2)  Further, any materials
accepted from a third party would count toward Clean Earth's
monthly minimum requirement, and Clean Earth was entitled to a
commission from the tipping fees that SLRD received from these
sources.  (*Id.*)

In addition, the amendment reiterated that if Clean Earth chose

> to convert the Exclusive Supply License to a non-exclusive license, the outstanding balance of all Advance Payments and Catch-Up Payments shall be credited against all Tipping Fees due to Redeveloper for Fill Material delivered to the Site and all future Tipping fees payable by Supplier (and not just for fees payable for Fill Materials in excess of the monthly minimum quantity).

(*Id.* ¶ 8)  Finally, the amendment stated, "All terms and conditions of the Agreement shall remain in effect, except as specifically modified by the terms of this letter agreement, or any prior or subsequent written instrument signed by the Parties in accordance with the Agreement." (*Id.* ¶ 12)

The third amendment to the Agreement took place on March 20, 2011 in response to "market conditions, allegations of default on the part of Clean Earth and discussions concerning the possible purchase of the landfill by Clean Earth." (RSMF[5] ¶ 81)  Under the terms of that amendment, Clean Earth agreed to pay SLRD $450,000 as an advance payment toward future Tipping Fees (Horne Decl. Ex. C ("March 20, 2011 Amendment") ¶ 1), and the parties agreed to waive other Catch Up Payments that Clean Earth would have been required to make. (*Id.* ¶ 2)  The amendment reaffirmed Clean Earth's Exclusive Supply License and confirmed that Clean Earth was not in default of the Agreement.

---

[5] RSMF refers to Defendant's Responsive Statement of Material Facts. (Dkt. No. 24)

(*Id.*)  Finally, the parties once again agreed, "All terms and conditions of the Agreement shall remain in effect, except as specifically modified by the terms of this letter agreement, or any prior or subsequent written instrument signed by the Parties in accordance with the Agreement."  (*Id.* ¶ 8)

In October 2011, Clean Earth entered into an agreement ("Ash Disposal Agreement") with Hilltop Enterprises, Inc. ("Hilltop") to dispose all of the fly ash material generated at the Chambers Cogeneration facility in Carney's Point, New Jersey ("Carney's Point").  (SUMF ¶ 39)  The fly ash material qualified as Fill Material under the Agreement between Clean Earth and SLRD.  Under the Ash Disposal Agreement, Clean Earth received fly ash material on a daily basis from Carney's Point, which it then delivered to the Site.  (*Id.* ¶ 40)  The Ash Disposal Agreement initially qualified only two locations at which the fly ash material could be disposed:  the Site and Clean Earth of North Jersey, Inc.'s Kearny, New Jersey facility ("CENJ").  (Aronson Decl. Ex. I ("Ash Disposal Agreement") 2)

That same month, Clean Earth exercised its option to become a non-exclusive licensee under paragraph 2.1.4(ii) of the Agreement.  (RSMF ¶ 87)  Clean Earth did not pay its invoice for October 2011.  (*Id.* ¶ 89)  Beginning in November 2011, SLRD asserted that it wanted to increase the Tipping Fees from $15.00 to $40.00 per ton (*id.* ¶ 90) and indicated that it would

8

restrict Clean Earth's access to the Site if Clean Earth did not agree to the increased Tipping Fees.  (SUMF ¶ 44)

In response to this dispute, the parties entered into an Interim Agreement on November 15, 2011.  (*Id.* ¶ 45)  Clean Earth agreed to pay its October 2011 invoice and prepay for its November and December deliveries of Fill Materials.  The prepayments were calculated using the $15.00 per ton Tipping Fee.  (Horne Decl. Ex. D ("Interim Agreement") ¶¶ 1-3)  For its part, SLRD agreed to continue to allow Clean Earth unrestricted access to the Site to deliver Fill Materials for the duration of the Interim Agreement.  (*Id.* ¶ 5)  SLRD also agreed to meet with Clean Earth "in an attempt to resolve all outstanding contractual disputes." (*Id.* ¶ 4)  The Interim Agreement includes the following provision:  "This Interim Agreement, while binding on the parties during the period covered hereunder, shall not be construed to waive or modify the terms of provisions of the Soil Supply Agreement in any way and the entire Agreement shall remain in full force and effect." (*Id.* at 2)

On January 30, 2012, the parties extended the Interim Agreement through March 31, 2012 "to allow the parties additional time to address the ongoing disputes regarding the Soil Supply Agreement." (Horne Decl. Ex. E ("Extension") 1) Under the terms of the Extension, Clean Earth agreed to "pay or

pre-pay for the anticipated quantity of Fill Material to be delivered in the months of January 2012 through March 2012 at the contract Tipping Fee of $15.00 per ton." (*Id.* ¶ 1)  SLRD agreed to keep the Site open to Clean Earth without restriction until the Interim Agreement Extension expired. (*Id.* ¶ 2)  SLRD further promised

> that it [would] not interfere with nor impede nor hinder in any way, directly or indirectly, the delivery of such Fill Material by Supplier to the Site and shall only deny access to Supplier if required to do so under NJDEP direction, or if Supplier fails to pay or pre-pay for fill materials contemplated herein.

(*Id.*)  As with the Interim Agreement, the Extension states, "This Interim Agreement, shall not be construed to waive or modify the terms or provisions of the Soil Supply Agreement, except as specifically provided herein, and the entire Agreement shall remain in full force and effect." (*Id.* at 1)

On Friday, March 30, 2012, SLRD threatened to close the Site to Clean Earth.  (SUMF ¶ 48)  The following day, March 31, 2012, Clean Earth sent a written default notice to SLRD, demanding that it keep the Site open. (*Id.* ¶ 49)  The Interim Agreement expired that day.  On April 1, 2012, SLRD closed the Site to Clean Earth (RSMF ¶ 96), and Brian Horne, SLRD's Managing Member, emailed Clean Earth's President, Steve Sands, to advise him of the closure. (SUMF ¶ 50)  In his email, Mr. Horne indicated that he was closing the Site in response to

Clean Earth's withdrawal from the Agreement. (*Id.*) Clean Earth attempted to deliver Fill Materials to the Site on Monday, April 2, 2012, but was turned away. (*Id.* ¶ 52)

At the time, the only Fill Materials that Clean Earth was delivering to the Site were fly ash materials from Carney's point. (*Id.* ¶ 56) After SLRD closed the Site to Clean Earth, Clean Earth began delivering the fly ash materials to CENJ, which was the only other approved disposal location under the Ash Disposal Agreement. (*Id.* ¶ 42) CENJ charged tipping fees of $89.00 per ton and is located further from Carney's Point. (*Id.* ¶ 58) Clean Earth delivered the fly ash materials to CENJ from April 1 to April 6, 2012. (*Id.* ¶¶ 57 & 61)

Beginning on April 9, 2012, Clean Earth began delivering materials to the Gloucester County landfill ("GCIA"), an alternative disposal location for which Clean Earth obtained approval. (*Id.* ¶ 60) Initially, Clean Earth paid tipping fees of $22.50 per ton to GCIA through a broker; GCIA now charges directly Clean Earth tipping fees of $17.00 per ton. (*Id.*) Clean Earth continues to dispose of the fly ash material at GCIA. (*Id.* ¶ 61)

Clean Earth initiated this action on April 3, 2012 (Dkt. No. 1) and has amended its Complaint twice. The Second Amended Complaint (Dkt. No. 6) contains seven counts, including claims for breach of contract, conversion, unjust enrichment, tortious

11

interference with contractual relations, indemnification, accounting, and specific performance. (Second Am. Compl.) SLRD filed a counterclaim alleging that Clean Earth owes SLRD $13,000.00 under the terms of the January 30, 2012 extension of the Interim Agreement. (Countercl. 9) On August 13, 2012, SLRD amended its Counterclaim to add a second count. (Dkt. No. 17)

In the second count of its Second Amended Counterclaim, SLRD alleges that Clean Earth is in default of paragraph 2.2.7 of the Agreement for failure to pay an invoice for costs associated with its obligations pursuant to that paragraph. Paragrah 2.2.7 provides,

> Redeveloper will, at its sole cost and expense, prepare the Site for receipt of the Fill Materials prior to commencement of the Supply Obligations, including installation of soil and erosion control measures as required by any governmental agency having jurisdiction, if required, with the understanding that all of the same, including all soil and erosion control measures, will be maintained by Supplier, at its sole cost and expense, after commencement of the Work.

(Supply Agreement ¶ 2.2.7) SLRD claims that paragraph 2.2.7 imposes an obligation on Clean Earth to maintain "all soil and erosion control measures . . . at its sole cost and expense." (Second Am. Countercl. 10) SLRD has admitted that Clean Earth was not in default of its obligation to maintain the Site under paragraph 2.2.7. (Aronson Decl. Ex. C ¶ 48)

On June 26, 2012, SLRD sent Clean Earth an invoice "for the costs expended on [Clean Earth's] behalf associated with

paragraph 2.2.7 as it relates to soil Erosion and Control Measures." (Aronson Decl. Ex. O) The description of services on the invoice is for "soil conservation, construction and maintenance" at a rate of $1,005,517.26, which is also the total amount billed to Clean Earth. (*Id.*) There were no itemized costs included in the invoice. According to SLRD, the invoice covers costs associated with maintaining the Site over the course of several years. (RSMF ¶ 110) To date, Clean Earth has not paid the invoice.

Clean Earth has moved for summary judgment on its breach of contract and unjust enrichment claims, Counts I and III of its Second Amended Complaint, respectively, and on Count II of SLRD's Second Amended Counterclaim.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable

13

to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 249.

Where the meaning of contract language is at issue, a party is entitled to summary judgment "only if the contract language is unambiguous," such that it "is subject to only one reasonable interpretation." *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 522 (3d Cir. 1999).  While "the threshold inquiry as to whether contract terms are ambiguous is a legal question," the interpretation of an ambiguous contract term is left to the factfinder. *Teamsters Indus. Employees Welfare Fund*

14

*v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 n.2 (3d Cir. 1993).

## III.

Clean Earth has moved for summary judgment on two of its affirmative claims and one of SLRD's counterclaims.  The Court will address each claim in turn.

### A.

Clean Earth first argues that it is entitled to summary judgment on Count I of its Second Amended Complaint for breach of contract.  To succeed on a breach of contract claim in New Jersey, the plaintiff must establish "that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. App. Div. 2007).

Neither party disputes the validity of the original Soil Supply Agreement executed on April 17, 2006.  Instead Clean Earth and SLRD disagree as to whether the Agreement remains in effect.  SLRD argues that "the history of amendment and renegotiation of the Supply Agreement has left it open to interpretation and continued renegotiation."  (D's Br. in Opp.

15

9)  But despite SLRD's assertions to the contrary, it is clear that the Agreement remains in effect.

First, there is no record evidence that shows that the contract ceased to be in effect when Clean Earth became a non-exclusive licensee in October 2011.  Despite Mr. Horne's deposition testimony that he believed that Clean Earth's decision to convert to a non-exclusive licensee "negate[d] the majority of [the] contract" (Horne Decl. Ex. L 34:20-21), there is nothing in the Supply Agreement to support his contention.  Four provisions of the Supply Agreement mention the exclusive license.  (*See* Supply Agreement ¶¶ 2.1.1, 2.1.2, 2.1.4 & 2.2.2)  Of these provisions, only paragraph 2.1.4 discusses what will happen if Clean Earth converts to a non-exclusive license.  This paragraph contemplates a circumstance in which Clean Earth could choose to become a non-exclusive licensee if it could not meet its monthly minimum tonnage of Fill Material.  (Supply Agreement ¶ 2.1.4)  That paragraph reserves the rights that were available to Clean Earth as an exclusive licensee:  "In the event of [Clean Earth's conversion to a non-exclusive license], the Advance Payment and any Catch Up Payments shall continue to be credited against future Tipping Fees payable by [Clean Earth] until fully offset."  (*Id.*)  By expressly maintaining these particular rights, this paragraph demonstrates that the

16

Agreement was intended to remain in effect even after Clean Earth's conversion to a non-exclusive licensee.

Second, although there were four subsequent amendments to the Supply Agreement, all of them express a clear intent to preserve the original Agreement. The July 6, 2010, and March 10, 2011 amendments state, "All terms and conditions of the Agreement shall remain in effect, except as specifically modified by the terms of this letter agreement, or any prior or subsequent written instrument signed by the Parties in accordance with the Agreement." (July 6, 2010 Amendment ¶ 12; Mar. 10, 2011 Amendment ¶ 8) Similarly, the November 15, 2011 Interim Agreement provides, "This Interim Agreement, while binding on the parties during the period covered hereunder, shall not be construed to waive or modify the terms or provisions of the Soil Supply Agreement in any way and the entire Agreement shall remain in full force and effect." (Interim Agreement 2) The January 30, 2012 Extension of the Interim Agreement likewise states, "This Interim Agreement shall not be construed to waive or modify the terms or provisions of the Soil Supply Agreement, except as specifically provided herein, and the entire Agreement shall remain in full force and effect." (Extension 1)

This language is unambiguous: notwithstanding any temporary amendments or suspension of obligations, the parties

17

clearly intended the initial Agreement to remain in effect and control all other obligations.  Thus, the first element – the existence of a valid contract – is met.

The second element of a breach of contract claim is whether the defendant failed to perform his obligations under the contract.  Here, Clean Earth argues that the Supply Agreement requires SLRD to keep the Site open to Clean Earth and allow Clean Earth to deliver Fill Materials to offset the $1.187 million that Clean Earth has already paid to SLRD.  Clean Earth further argues that SLRD cannot accept materials from third parties because SLRD was required to give Clean Earth's materials priority.  (P.'s Br. 15)  SLRD contends that its obligation to accept fill materials on a priority basis from Clean Earth ended once Clean Earth chose to become a non-exclusive licensee and that it had no obligation to keep the Site open to Clean Earth or accept Clean Earth's Fill Materials once Clean Earth stopped making prepayments.  (D.'s Br. in Opp. 9-10)

Clean Earth's argument rests on reading two clauses of paragraphs 2.1.4 and 2.2.2 of the Agreement in tandem:

> The Supply Agreement requires SLRD to accept delivery of
> Fill Materials delivered to the Site by Clean Earth "on a
> priority basis in such amounts as necessary to fully
> utilize" that prepayment.  [Supply Agreement ¶ 2.2.2]  Even
> after Clean Earth converted its exclusive license to a non-
> exclusive license, the Supply Agreement required that "the
> Advance Payment and any Catch Up Payments shall continue to

18

be credited against future Tipping Fees payable by [Clean Earth] until fully offset." [*Id.* ¶ 2.1.4]

(P.'s Br. 15)  The Court examines each of these clauses.

Clean Earth relies on paragraph 2.2.2 of the Supply Agreement in support of its contention that SLRD must accept materials from Clean Earth on a priority basis as long as SLRD "hold[s] a balance of advanced payments made by Clean Earth." (P.'s Br. 5)  Paragraph 2.2.2 provides,

Redeveloper shall accept delivery of Fill Materials delivered to the Site by Supplier in accordance with the terms and conditions of this Agreement.  Notwithstanding any Exclusive Supply License . . . , Redeveloper may accept delivery of materials from MART to the extent that MART is entitled to make delivery of materials to Redeveloper under a previously executed Strategic Alliance Agreement which expires February 1, 2007.  Supplier shall not extend or modify the terms of its Strategic Alliance Agreement with MART and Supplier represents that materials delivered by MART to the site shall be subject to payment of tipping fees in a minimum amount of $15.00 per ton. Notwithstanding the foregoing, **Redeveloper shall accept all Fill Materials provided by Supplier on a priority basis in such amounts as necessary to fully utilize credit against Tipping Fees against the Advance Payment made by Supplier.**

(Supply Agreement ¶ 2.2.2 (emphasis added))  Clean Earth points to the highlighted clause and argues that it applies even though Clean Earth opted to become a non-exclusive licensee.  Apart from this provision, the Agreement is silent as to whether SLRD is required to accept materials from Clean Earth on a priority basis.  While Clean Earth's interpretation of that clause is reasonable, it is not the only possible reading.

19

When read with the rest of the paragraph, the clause lends itself to a different interpretation.  Most of the paragraph discusses how Clean Earth and SLRD would proceed under the exclusive license if a third party, MART, delivered fill materials to the Site.  Only after Clean Earth's and SLRD's respective obligations in that situation are detailed does the clause at issue here appear.  Thus, a reasonable reading of that provision is that SLRD's obligation to accept Clean Earth's Fill Materials on a priority basis applied only if SLRD was accepting materials from MART at the same time.  Because this clause is subject to more than one interpretation, the Court cannot say that the Agreement unambiguously requires SLRD to accept materials from Clean Earth on a priority basis.

Nor can the Court say that the clause unambiguously requires SLRD to keep the Site open to Clean Earth until the $1.187 million advance payment is fully offset now that Clean Earth is no longer an exclusive licensee.  Again, it is not clear whether the provision applies outside the context of the exclusive license relationship.

Clean Earth also argues that paragraph 2.1.4 imposes an obligation on SLRD to accept delivery of Fill Materials to offset the $1.187 million prepayment even after Clean Earth became a non-exclusive licensee.  (P.'s Br. 15)  The specific provision on which Clean Earth relies states that in the event

that Clean Earth converts to a non-exclusive license, "the Advance Payment and any Catch Up Payments shall continue to be credited against future Tipping Fees payable by [Clean Earth] until fully offset." (Supply Agreement ¶ 2.1.4) While this clause might impose an obligation on SLRD to use any advance payments that Clean Earth makes to offset future Tipping Fees in a non-exclusive license situation, in the absence of a provision that requires SLRD to accept materials from Clean Earth, the clause has no teeth.[6] As such, the Court cannot find that summary judgment is warranted on Clean Earth's breach of contract claim.[7]

**B.**

Clean Earth next argues that it is entitled to summary judgment on its unjust enrichment claim because SLRD has accepted $1.187 million in prepayments from Clean Earth but will not allow Clean Earth to deliver materials such that Clean Earth may benefit from the prepayments. (P.'s Br. 17)

---

[6] Though most of paragraph 2.2.2 could be read to apply only in the context of an exclusive license relationship, the first sentence seems to stand on its own. That sentence might impose an obligation on SLRD to remain open and accept delivery of Clean Earth's Fill Materials for as long as the Agreement is in effect. (Supply Agreement ¶ 2.2.2) But as Clean Earth has not argued that this sentence provides the foundation for SLRD's breach, the Court is reluctant to rely on it.

[7] As the second element of breach of contract is unmet here, the Court need not address the damages element this claim.

"Under New Jersey law, '[t]he constructive or *quasi-contract* is the formula by which enforcement is had of a public duty raised to prevent unjust enrichment or unconscionable benefit or advantage.'" *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226 (3d Cir. 1983) (quoting *West Caldwell v. Caldwell*, 138 A.2d 402, 412 (N.J. 1958)). "To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 554 (N.J. 1994). Where "an express contract exists concerning the identical subject matter," a plaintiff cannot recover on a theory of unjust enrichment. *Suburban Transfer*, 716 F.2d at 226-27.

While it is undisputed that Clean Earth paid SLRD $1.187 million in prepayments, which have not been offset by delivery of Fill Materials, and that SLRD refuses to accept delivery of Clean Earth's Fill Materials, the Court will not grant summary judgment in favor of Clean Earth on its unjust enrichment claim. Unjust enrichment is a quasi-contractual remedy and thus will not be imposed where an express contract governs the rights of the parties involved. *See Suburban Transfer*, 716 F.2d at 226; *Van Orman v. American Ins. Co.*, 680 F.2d 301, 311 (3d Cir. 1982) (construing New Jersey law); *St. Paul Fire & Marine Ins. Co. v. Indemnity Ins. Co.*, 158 A.2d 825, 828 (N.J. 1960). In making

22

its breach of contract argument, Clean Earth has contended vigorously that there is a valid contract here.  That contract controls here.

The Agreement as well as the subsequent Amendments and Interim Agreement indicate that prepayments will be used to offset future Tipping Fees.  In addition, the November 15, 2011 Interim Agreement and the January 30, 2012 Extension both state that if the amount of Clean Earth's prepayments made for the months of November 2011 through March 2012 exceeded the volumes actually delivered for those months, SLRD would refund those payments to Clean Earth.  (Interim Agreement 2; Extension 2) Thus, the subject matter at issue here falls squarely within the contract's terms.

As it is clear that the prepayment is governed by the parties' express agreement, breach of contract, not unjust enrichment, is the proper avenue for Clean Earth to recover its prepayment.  Accordingly, the Court will deny summary judgment on Clean Earth's unjust enrichment claim.[8]

### C.

Finally, Clean Earth seeks summary judgment on Count II of

---

[8] The Court's denial of summary judgment here does not prevent Clean Earth from raising this claim at trial as an alternative theory of liability should its breach of contract claim fail.

SLRD's Second Amended Counterclaim.[9]   SLRD claims that Clean

Earth failed to pay an invoice for $1,005,517.26 for costs that

SLRD allegedly incurred pursuant to paragraph 2.2.7 of the

Agreement, which provides,

> Redeveloper [SLRD] will, at its sole cost and expense,
> prepare the Site for receipt of the Fill Materials prior to
> commencement of the Supply Obligations, including
> installation of soil and erosion control measures as
> required by any governmental agency having jurisdiction, if
> required, with the understanding that all of the same,
> including all soil and erosion control measures, will be
> maintained by Supplier [Clean Earth], at its sole cost and
> expense, after commencement of the Work.

(Supply Agreement ¶ 2.2.7)   SLRD asserts that this paragraph

requires Clean Earth to bear the cost of any maintenance

performed on the Site, even if Clean Earth did not perform the

maintenance itself.   The Court disagrees.

Paragraph 2.2.7 indicates only that SLRD was responsible

for preparing the Site at its sole expense and that Clean Earth

had a responsibility to maintain the Site.   If Clean Earth

performed any maintenance, then it would bear the cost and

expense of doing so.   The language does not contemplate a

scenario in which a party other than Clean Earth would perform

maintenance on the Site and then bill Clean Earth for that

maintenance at a later date.   At most, paragraph 2.2.7 would

allow SLRD to claim that Clean Earth breached its obligation to

---

[9] SLRD's Second Amended Counterclaim (Dkt. No. 17) contains two counts.
Although Clean Earth's papers repeatedly refer to "SLRD's counterclaim," the
arguments contained therein address only Count II of SLRD's Counterclaim.

perform maintenance on the Site.  However, SLRD admits that
Clean Earth was not in default of its obligation to maintain the
Site.  (Aronson Decl. Ex. C ¶ 48)  Rather, SLRD claims that
Clean Earth's default is based on Clean Earth's failure to pay
the SLRD's invoice for work that SLRD undertook.  But as Clean
Earth is not obligated under paragraph 2.2.7 to pay another
party for work which that party performed to maintain the Site,
Clean Earth is not required to pay SLRD's invoice for work that
SLRD chose to undertake.[10]  Accordingly, the Court will grant
summary judgment in favor of Clean Earth on Count II of SLRD's
Second Amended Counterclaim.


## IV.

    For the foregoing reasons, summary judgment will be granted
in favor of Plaintiff on Count II of Defendant's Second Amended
Counterclaim.  Summary judgment will be denied as to Counts I
and III of Plaintiff's Second Amended Complaint.  An appropriate
Order accompanies this Opinion.


Date:  May 2, 2013

                                  /s/ Joseph E. Irenas _____

                                  **Joseph E. Irenas, S.U.S.D.J.**

---

[10] The Court takes no position as to whether SLRD actually incurred the
alleged costs in the course of performing maintenance on the Site.